No. 19,546.

SADIE PULLIN, as Administratrix, etc., *Appellee*, v. THE MISSOURI, KANSAS & TEXAS RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. NEGLIGENCE—*Death of Switchman under Cars—Certain Rules of Company Abrogated and Not in Force.* In an action to recover for wrongful death the findings and evidence show that deceased was a switchman and was killed by the movement of a string of cars under which he was working in the nighttime, assisting in chaining up a defective drawbar. The track upon which the cars stood was a half mile long and connected at either end with a lead track. It was used for storing bad-order cars, and it was customary for either the north or south crews to put cars on the track whenever occasion required. While the plaintiff, a member of the south crew, was at work under the car the north crew shoved a car in at the north end against the string, causing the cars to move a distance of eighteen feet. The jury found that it was usual and customary for the north crew to switch cars upon the track if occasion arose, unless warned not to do so by a flagman or signal, but that the written rules of the company requiring a blue flag by day and a blue light by night to be displayed at one or both ends of such train had been abrogated and were not in force at the time of the accident. *Held*, that there was evidence sufficient to support the finding, and that therefore the defendant could not rely as a defense upon the existence of the rules and the violation of them by the deceased.

2. SAME—*Negligence Found by Jury Not Supported by Any Evidence—Specific Finding Inconsistent with General Verdict.* The jury further found that the deceased placed no signals and took no precaution to protect the string of cars under which he was working from being struck or moved by cars from the north, and that the defendant's negligence which caused the death of deceased consisted in the foreman of the north crew giving a hard back-up signal, causing the car to be

pushed against the string with force and violence. *Held*, that the specific finding of the negligence of the defendant is an express finding that the verdict is not based upon any other character of negligence, and the finding being unsupported by any evidence, and this ground of negligence not having been submitted to the jury, it is inconsistent with the general verdict and must control, and therefore defendant is entitled upon the findings to a judgment for costs.

Appeal from Labette district court; ELMER C. CLARK, judge. Opinion filed July 10, 1915. Reversed.

*W. W. Brown, James W. Reid,* and *E. L. Burton,* all of Parsons, for the appellant.

*C. E. Pile,* of Parsons, *J. A. L. Wolfe, J. H. Wood,* and *James P. Haven,* all of Sherman, Tex., for the appellee.

The opinion of the court was delivered by

PORTER, J.: The plaintiff's husband while employed as a switchman was killed in the yards of the defendant at Parsons. She recovered a judgment in this action, from which the defendant appeals.

The facts briefly stated are these: There are sixteen tracks in defendant's yards at Parsons which are numbered consecutively from 1 to 16. They are one-half mile long and eight of them connect with what is known as the "south lead" and the same number with what is known as the "north lead." Track number 11 is set apart for the reception during switching operations of all bad-order cars which require removal for repairs. When sufficient cars have accumulated on this track to form a string or train, an engine called the "bum" engine is coupled to them and they are removed to the repair tracks, distant more than one-half mile. On January 19, 1912, a car loaded with lumber from Louisiana arrived at Parsons. The coupler and draft rigging of this car were broken and it was set on track number 11, marked "bad order." About 5:30 on the morning of January 22, the "bum" engine with a switching crew came on track number 11 at the south end and moved up to the string of bad-order cars, coupling to the first car, which stood a distance of from six to eight car lengths north of the south end of track number 11. Minnehan, foreman of the engine crew, and Pullin, the husband of the plaintiff, rode on the front end of the engine, and when it was coupled to the

first car at the south end they went with their white lights along the east side of the string of cars. In a very few minutes the foreman returned to the engine and secured a chain, informing the engineer that he was about to chain up a bad-order car. Shortly afterwards a switching crew came in from the north lead on track number 11 for the purpose of setting one car on the same track, and they shoved this car against the north end of the string with sufficient force to move the whole string about 15 or 18 feet, although the engine at the south end had its brakes set. Minnehan was killed outright between the cars, and Pullin was found lying between tracks 11 and 12, fatally injured. He died shortly after. The chain which Minnehan had taken from the engine was lying across the axle of the car which has been referred to as the one loaded with lumber. It appears from the evidence of plaintiff and defendant that track number 11 was used both by the north lead and south lead crews for the purpose of switching cars in from either end constantly and at all times. Either crew had the right to use the track.

The petition alleged negligence in the following particulars: (a) Switching cars from the north end of the track without any warning or notice to the deceased and the persons engaged in operating the switch engine where he was employed. (b) Switching cars from the north end without exercising ordinary prudence to ascertain that deceased was at work under the car. (c) Switching cars from the north end upon track number 11 with violence. (d) Switching cars into track number 11 from the north end when the track was already full of cars. (e) Failure of Foreman Minnehan to take proper steps to protect the deceased.

The negligence charged in paragraph "e" respecting the acts of the foreman Minnehan was eliminated by the court on a demurrer to the evidence. The negligence charged in paragraph "d" in switching cars from the north end when track number 11 was already full of cars may be regarded as eliminated because there was no evidence to support it, and for other reasons which will be noted. The evidence of the plaintiff shows that the track was not full of cars, but that on the contrary when the switching crew moved from the south end and coupled to the string of cars there was still room at the

south end for at least six or eight cars. Besides, the petition neither alleged nor was there any proof offered to show that defendant owed to the deceased any duty in this respect or that he had any right to rely upon the company not using the track for the purpose of putting more cars on it. It is apparent from the evidence that the attempt of defendant to use the track for the purpose of putting the car in from the north end was not in any respect the proximate cause of the injury. The negligence charged under paragraphs "a," "b" and "c" remain to be considered.

It is the contention of the defendant that the evidence introduced by the plaintiff is not sufficient to show any negligence causing the injury. One defense alleged by the answer and sought to be sustained by the evidence of the defendant is based upon certain rules and regulations which it is claimed were in force but disregarded by the deceased. The first of these to which we will refer is "article 8," which is a part of an agreement entered into in 1911 between the defendant and the Brotherhood of Railway Trainmen, of which the deceased Pullin was a member. This clause of the agreement declared that in Parsons and certain other yards of the defendant workmen will not be required "to handle cars on rip tracks which have no draw bars, unless chained together by car department employees." The evidence of the defendant showed that in the yards at Parsons there were at this time carmen or employees of the car department, whose headquarters or shanty was close to track number 11, about 150 or 200 feet away, and that there was an ample force of carmen to do the work of chaining up the disabled car at the time the plaintiff was injured. A great deal of defendant's brief is taken up with a discussion respecting the failure of the plaintiff to show that either the deceased or the foreman Minnehan called for the carmen to do the work. We think this defense may be readily disposed of. Article 8 simply declares that workmen will not be required to handle cars on rip tracks which have no drawbars unless chained together by car department employees. Track number 11 was not a rip track. Cars were not repaired there. They were stored on this track temporarily until a sufficient number of them had accumulated to make up a string to be moved to the repair track. Moreover, there was evidence

offered by the plaintiff to show that the provisions of article 8 requiring carmen to place chains on bad-order cars where the draw-bar is out were not strictly enforced by the defendant in January, 1912, and that train crews frequently placed chains on cars. The defendant's abstract purports to give the substance of witness Mundon's testimony, but omits certain portions of it which we find in the counter-abstract. This witness testified to the effect that the storeroom of defendant furnished chains to the engine crews and switch crews for the purpose of chaining bad-order cars. The same witness, as appears by plaintiff's counter-abstract, testified that he had personal knowledge of switchmen chaining up bad-order cars as late as January, 1912, and that "they did off and on." He had seen a foreman of a switch crew chain up bad-order cars in 1911. It is true that he was not employed under Smith, who was yardmaster at the time Pullin was injured, and never was present when the yardmaster directed anybody to chain up bad-order cars after July, 1909, but there is sufficient evidence to show that even if article 8 should be construed as applying to bad-order cars standing on track number 11, it was often violated; and the fact that the storeroom department furnished chains to switching crews for the purpose of chaining bad-order cars, and that trainmen for several years had been in the habit of doing such work, was sufficient to support a finding that this provision of the contract between the brotherhood and the defendant had been abrogated, if its violation by the deceased furnished any defense, which we do not decide.

Certain other rules of the company upon which the defendant relies are the following:

"26. A blue flag by day and a blue light by night, displayed at one or both ends of an engine, car or train, indicates that workmen are under or about it. When thus protected it must not be coupled to or moved. Workmen will display the blue signals and the same workmen are alone authorized to remove them. Other cars must not be placed on the same track so as to intercept the view of the blue signals, without first notifying the workmen.

"8. Flags of the prescribed color must be used by day, and lamps of the prescribed color by night."

The evidence of both plaintiff and defendant shows that the blue-flag or blue-light rule was not complied with by the crew to which the deceased belonged. On the contrary the evidence

shows that the string of cars on which Minnehan and the deceased were working was not protected in any way. There were no blue lights set out. No one was sent ahead to the north end of the string for the purpose of notifying switch crews at that end that persons were at work under the cars at the south end. There is no dispute in the evidence with respect to the failure of the train crew to which the deceased belonged to take any precautions to protect themselves or to comply with the provisions of rules 26 and 8. The evidence also shows that white lights such as were carried by Minnehan and Pullin at the time are not signals of danger, for the reason that employees were moving about the yards at all times during the night with white lights. Track number 11 was about one-half mile long. The evidence shows that no one of the north crew saw Pullin or Minnehan along that string of cars or knew that they were about or under the cars. The defendant further relies upon the fact that there was no evidence offered tending to show that it was the duty of the north crew to go along this track and examine the cars to see that no one was under them; no evidence to show a custom or duty of the north crew to give warning or notice of any kind that they were about to switch cars in or upon the north end. As already stated, it is not disputed that the track was used both by the north lead and the south lead crews for the purpose of switching cars at either end. In doing this work the cars would necessarily be bumped considerably.

The jury made certain findings which it is insisted entitled the defendant to judgment. These findings upon which the defendant relies are:

"15. Under the rules of defendant, was it the duty of deceased and Tim Minnehan to have carmen put chains on said car? Ans. Yes.

"4. Was it usual and customary on and before January 22, 1912, for the north lead engine to switch cars into and upon Track No. 11 if occasion arose, unless warned not to do so by a flagman or a signal? Ans. Yes.

"7. Did the deceased place signals or take any precaution to protect the string of cars in or under which he was working when killed, from being struck or moved from the north? Ans. No.

"12. If you find that defendant's employe was negligent causing the death of Samuel Pullin, state the name of such employe? Ans. Foreman Stipp.

"13. If you find that any of defendant's employes was negligent caus-

ing the death of Samuel Pullin, state the nature of such negligence? Ans. By giving hard back up signal."

Finding number 15 that it was the duty of the trainmen and of deceased to have the chains put on the car by employees of the car department does not of itself entitle defendant to judgment, because, as we have shown, if article 8 can be said to apply to the chaining up of cars on track number 11, there was evidence to support a finding that the regulation had been in effect abrogated by the custom and practice of train crews for a sufficient length of time to bring to the officers of defendant constructive notice thereof, and that defendant is therefore not entitled to rely upon article 8 as a defense. We are unable to concur in the claim of defendant that the answer to question 15 amounts in substance to a finding that article 8 of the trainmen's contract was being complied with in the yards at Parsons at the time the deceased was injured. We think it amounts to nothing more than a finding that under the literal terms of article 8 it was the duty of the deceased to have carmen put chains on the car. The jury obviously did not mean by their answer that the regulation had not been modified or abrogated by custom and practice known to the defendant, or which could have been known by the exercise of ordinary care and diligence.

Findings numbers 4 and 7, that it was usual and customary for the north lead crew to switch cars upon this track unless warned not to do so by a flagman or signal, and that the deceased did not place signals or take any precaution to protect the string of cars under which he was working from being struck or moved by cars from the north, present a difficult question. The plaintiff insists that all difficulty in this respect is removed by finding number 5, to the effect that rules 26 and 8 requiring a blue flag by day and a blue light by night displayed at one or both ends of a train to indicate that workmen are under or about it were "in force but not enforced." On the other hand, the defendant contends that this finding is without any support in the evidence and challenges plaintiff to point to any evidence to sustain the finding. The plaintiff attempts to meet the challenge by the claim that it was the duty of the defendant to offer evidence that rules 26 and 8 were enforced and that in the absence of any such affirmative testimony the defense based upon the failure to comply with the rules must fail. In this contention we think the plaintiff is wrong, and

when the rule was shown to have been adopted the burden rested upon the plaintiff to show that it had been abrogated by custom and practice, and that the custom and practice should have been known by the defendant. The only evidence we have been able to find in the abstracts bearing at all upon this question is found in the testimony of two witnesses, one called by the defendant and one called by the plaintiff. Briggs, a witness for defendant, on cross-examination testified as follows:

"Q. Did the switch crews in that yard carry blue lights? A. No, sir.

"Q. Don't use them do they? A. They use them on some occasions, I think.

"Q. Switch crews? A. If it is necessary they get one. Yes, sir.

"Q. Did you ever see them carrying a blue light? A. Well I can't say that I ever did.

"Q. No, never saw one up there did you? A. Yes, sir; I have seen them up there.

"Q. When? A. Well, I think it has been since that accident occurred.

"Q. Since the accident occurred. I am talking about before the accident occurred. You never saw it then did you? A. I don't remember of it.

"Q. How long had you been working there before the accident? A. I went to work there in June, 1911."

One of the north-end crew who was a witness for plaintiff testified that he never saw blue lights carried on switch engines and never saw any switch crews there using blue lights. This was some testimony, perhaps very slight, but sufficient to support finding number 15 to the effect that rules 26 and 8 were not enforced.

But this evidence removes only a part of the difficulty presented by findings 4 and 7. Conceding that deceased was not bound by the existence of the written rules, the jury find in answer to question 4 that it was usual and customary for the north-end crew to switch cars upon this track unless *warned not to do so* by a flagman or signal, and in number 7 the finding is that the deceased took no precaution of any kind to protect the string of cars under which he was working from being struck by cars moved from the north end. Both findings are in accord with the undisputed evidence.

By findings 12 and 13 the jury say that the negligence which caused the death of the deceased was the giving of a hard back-up signal by the foreman of the north crew. The judgment

Pullin v. Railway Co.

based upon this ground of negligence can not stand. In the first place the court did not submit this claim of negligence to the jury in any of the instructions. It is true the petition alleged that the defendant negligently shoved the cars with such speed and violence that deceased was unable to escape from between the cars where he was working, but there was no evidence to show that the force or violence with which the cars were shoved was the proximate cause of the injury, nor was there either allegation or proof of any duty the defendant owed the plaintiff to move the cars in a different manner. Besides, it is quite obvious that the force with which the north crew shoved the car against the string had nothing to do with the accident. The evidence showed that it was necessary to move the string of cars to make room for one car; and to move them any such distance with the men at work under them must necessarily have resulted in the same injury to the deceased. There was no fact offered in evidence from which the jury could infer that the result would have been any different if the cars had been moved the same distance with less force. Negligence must be the proximate cause of an injury in order to be actionable. (*S. K. Rly. Co. v. Griffith,* 54 Kan. 428, 38 Pac. 478; *Railroad Co. v. Justice,* 80 Kan. 10, 101 Pac. 469.)

The specific finding that the negligence of the defendant consisted in the giving of a hard back-up signal by the foreman of the north crew is an express finding that the verdict is not based on any other form or character of negligence, and under the repeated rulings of the court the special findings, being inconsistent with the general verdict, must control. (Civ. Code, § 294; *Railway Co. v. Roth,* 80 Kan. 752, 756, 104 Pac. 849, followed and reaffirmed in the recent case of *Adams v. Railway Co.,* 93 Kan. 475, 481, 144 Pac. 999; *Tecza v. Sulzberger & Sons Co.,* 92 Kan. 97, 98, 140 Pac. 105.)

It follows that the judgment must be reversed and the cause remanded, with directions to enter judgment for defendant upon the findings.

JOHNSTON, C. J., concurs in the reversal but dissents from the direction to enter judgment for the defendant.